1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9   EULA KOLB,                    )    1:07-cv-0262 OWW DLB
                                   )
10            Plaintiff,           )    FINDINGS OF FACT AND
                                   )    CONCLUSIONS OF LAW
11      v.                         )
                                   )
12   WILLIAM PAUL TURNER, DOING    )
     BUSINESS AS McCARTY'S COPPER  )
13   INN; and DOES 1 through 10,   )
     inclusive,                    )
14                                 )
              Defendants.          )
15                                 )
     _____)
16

17

18          This matter came before the Court for trial without a jury on

19   December 3, 2008.  Plaintiff, Eula Kolb, was represented by Ray

20   Ballister, Esq. from the Center for Disability Access, LLP.

21   Defendant, William Paul Turner, was represented by Michael D.

22   Macomber, Esq.  The parties submitted trial briefs, the testimony

23   of witnesses and exhibits, opening statements, and closing

24   arguments.  The Court has considered all the submissions of the

25   parties and enters the following Findings of Fact and Conclusions

26   of Law.  To the extent that any finding of fact may be interpreted

27   as a conclusion of law, or the converse, the finding is so

28   intended.

                                  1

## I.  FINDINGS OF FACT

1.    Plaintiff, Eula Kolb ("Plaintiff" or "Kolb"), is a resident of Copperopolis, California, in the Eastern District of California and is a disabled individual within the meaning of the Americans with Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh Act") and Disabled Persons Act ("CDPA").

2.    Brian Wilson ("Wilson"), an individual who is a non-party to this lawsuit, is Kolb's life partner and shares a residence with Kolb.

3.    Defendant, William Paul Turner ("Defendant" or "Turner"), is an individual who does business as McCarty's Copper Inn ("McCarty's"), a gasoline station and convenience store in Copperopolis, California.

4.    McCarty's is open to the public and is owned and operated by Defendant.

5.    Defendant owns the real estate upon which McCarty's is situated.

6.    Kolb instituted a previous action in state court under the ADA and relevant California law alleging violations by Defendant's business which lacked a handicapped accessible bathroom.

7.    The prior lawsuit was settled and documented by an Agreement Of Settlement And Release ("Settlement Agreement"), Exhibit JX4, which was duly executed by Kolb on December 12, 2006, and by Nancy Lee Turner and William Paul Turner dba McCarty's Copper Inn on December 24, 2006.  "Nancy Lee Turner" and "William Paul Turner dba McCarty's Copper Inn" were collectively designated as "Defendants" in the Settlement Agreement.

2

1     8.   The Settlement Agreement was, by its terms, confidential.

2     9.   Paragraph 10 of the Settlement Agreement entitled
3  "<u>CONFIDENTIALITY</u>" provides that "[t]his Agreement and the terms
4  thereof shall be maintained in strict confidence by all parties.
5  No party shall initiate, nor participate in, a press release, press
6  conference or other public disclosure of the settlement embodied by
7  this Agreement, it being agreed by all Parties that the policy of
8  the law is best served by private settlements. In the event of
9  press or other inquiry, the Parties agree they will have no
10 comment.   The terms of this Agreement shall only be disclosed
11 pursuant to lawful process or judicial order, and/or to spouses and
12 legal and tax advisors."

13     10.  Performance called for under the Settlement Agreement
14 included payment to Kolb of the sum of $5,000, payable to Kolb and
15 her counsel.

16     11.  Under the Settlement Agreement, Defendants were to
17 provide a van accessible parking space and an accessible restroom
18 facility in the form of either a portable accessible restroom or a
19 permanent accessible restroom facility, all in compliance with the
20 ADA Accessibility Guidelines and Title 24 of the California Code of
21 Regulations.

22     12.  No evidence was presented that Defendant failed to
23 perform the terms of the settlement.

24     13.  The state court lawsuit was dismissed with prejudice.

25     14.  At least by President's Day weekend, in February 2007,
26 Turner had posted a sign at McCarty's in words and figures as
27 follows, Exhibit JX2.1:

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Due to a lawsuit from
EULA KOLB

Restroom is CLOSED until
April 15, 2007
when a new facility will
be available

Sorry for any inconvenience
McCarty's Copper Inn

15.  In late March or early April 2007, a portable ADA compliant restroom was brought on site.

16.  Exhibit JX2.1 was taken down and a new sign, Exhibit JX2.2, was posted in words and figures as follows:

Due to a lawsuit from
EULA KOLB

THIS RESTROOM IS
CLOSED

The ADA compliant portable
restroom is now available.

------->

Sorry for any inconvenience McCarty's Copper Inn

17.  Exhibit JX2.2 was posted until April 15, 2007.

18.  Turner testified that he posted the signs in response to questions from customers inquiring why the existing bathroom was closed.

19.  Turner testified that he was angry about Kolb's original state court lawsuit and was unhappy to be the subject of that lawsuit.

20.  Turner testified that he was not happy about the settlement and having to pay money to remodel the bathroom.

21.  Turner evidenced bias against Plaintiff and her prior ADA claims.

22.  Turner testified that he felt bad that he had to remodel

4

1  the bathroom.

2       23.  Turner denied posting the signage to embarrass Plaintiff.

3       24.  Turner testified that he had no intent to embarrass or
4  disparage Plaintiff.

5       25.  The evidence established by inference that Turner was
6  still unhappy about and frustrated by the initial lawsuit brought
7  by Kolb.

8       26.  Turner testified that when he posted the signage,
9  questions from customers were generated, some of which he answered.
10 Turner denied, however, talking openly and freely with customers
11 about the nature of the original state court lawsuit.

12      27.  Turner had approximately three to four employees at
13 McCarty's in the first part of 2007.

14      28.  All McCarty's employees wear Chevron-approved shirts with
15 name badges.

16      29.  McCarty's dispenses and sells propane to the public.

17      30.  A propane tank is located to the rear of the building,
18 approximately 100 feet in back of the store.

19      31.  Turner is the only representative of McCarty's who is
20 authorized or trained to dispense propane.

21      32.  When Turner is the only representative at the store, he
22 is not available to dispense propane to customers.

23      33.  It is Kolb's practice, due to the limits on dispensing
24 propane, to call McCarty's in advance to confirm Turner's
25 availability to dispense propane before Wilson sets out to purchase
26 propane.

27      34.  Other customers also call in advance to confirm Turner's
28 availability to dispense propane.

1   35.   Wilson testified that he refills their propane tank
2   approximately once every two weeks.

3   36.   Wilson testified that he and Kolb barbecue their food and
4   use a propane barbecue to cook their meals.

5   37.   There is no evidence that, over the telephone, Turner or
6   any other representative of McCarty's ever refused to dispense
7   propane for Wilson or Kolb.

8   38.   Kolb testified that 2005 was the last time she was in the
9   store.   There is no evidence that Kolb was physically within the
10  store during the one to two years prior to the January 2007 through
11  April 2007 time period.

12  39.   Wilson asserted that Turner denied him propane on three
13  separate occasions in the January 2007 through March 2007 time
14  period, with the first denial occurring in January 2007.   Wilson
15  formed no opinion as to why Turner refused service.

16  40.   Wilson testified that in January 2007, Kolb called
17  McCarty's and confirmed that propane could be purchased.

18  41.   Wilson traveled to McCarty's to purchase propane.

19  42.   Wilson testified that when he inquired about purchasing
20  propane, Turner told him: "No, not today."

21  43.   Wilson did not testify that this had ever happened
22  before.

23  44.   Wilson testified that Turner did not make eye contact and
24  did not explain why propane would not be available.

25  45.   Wilson testified that, when he was facing the counter, he
26  turned clockwise and, in an oval mirror, saw the image of a girl
27  with dark hair kneeling near some merchandise.   Wilson did not say
28  he saw her face.   Wilson believed the girl was an employee.   He did

6

1  not describe her clothing.

2      46.   Turner testified that the only mirror in the store is
3  near the entrance door to the store on the right-hand side as a
4  customer exits, which, from the vantage point of a person standing
5  at the counter, is to the left of the counter and to the right side
6  of the entrance door.

7      47.   Turner testified that there is no mirror above the cooler
8  or beer box.

9      48.   The evidence does not preponderate to show that the girl
10 Wilson allegedly observed was an employee.  If she were a customer,
11 this would provide another reason for Turner not to leave the store
12 to dispense propane.

13     49.   Turner testified that some customers leave propane tanks
14 to be filled.  He did not testify that Kolb and Wilson ever dropped
15 off a propane tank to be filled.

16     50.   Turner testified he had no recollection of speaking to
17 Kolb over the telephone regarding the purchase of propane in the
18 January 2007 through March 2007 time period.

19     51.   Turner testified that he refused to sell propane to
20 Wilson once in the January 2007 to March 2007 time period, on a
21 Sunday evening around 6:00 to 6:30 p.m.

22     52.   On this occasion, Turner told Wilson that Turner was
23 unable  to  dispense  the  propane  because  he  was  the  only
24 representative at the store.

25     53.   Turner denied refusing to sell propane to Wilson on any
26 other occasion during the January 2007 through March 2007 time
27 period.

28     54.   Turner acknowledged that it is Kolb's practice to call in

7

1  advance when she and Wilson purchase propane.  Turner testified

2  that Kolb does not always call before they come to the store to buy

3  propane.

4     55.  There is no evidence rebutting Turner's testimony that

5  when he is the only person on duty in the store propane is not

6  dispensed.

7     56.  Wilson testified that of the three occasions that he was

8  denied propane, the first occasion is the only one on which he saw

9  someone else in the store, besides Turner, who he believed was an

10 employee.

11    57.  Wilson testied that, on one occasion, date and time

12 unspecified, he asked Turner if he could purchase ice at the sales

13 counter and Turner refused saying "no ice."

14    58.  Turner explained that ice is kept in an ice cooler inside

15 the store.  Patrons help themselves to ice, bring it to and pay for

16 it at the sales counter.

17    59.  Wilson acknowledged that the ice is kept in an unlocked

18 ice cooler and that the ice is there for customers to grab

19 themselves and bring to the counter.

20    60.  Turner had no recollection of ever refusing to sell ice

21 to Wilson.

22    61.  Wilson testified that he sought to purchase the propane

23 at approximately ten minutes before 6:00 p.m.  Store hours were

24 5:00 a.m. to 7:00 p.m., Monday through Friday, and 6:00 a.m. to

25 6:00 p.m. on Saturday and Sunday.

26    62.  Wilson testified that he has been visiting McCarty's for

27 the past 40 years.  He did not identify any other adverse activity

28 in his patronage of McCarty's.

8

63.   Wilson could not identify the dates or times of the other two alleged refusals to sell propane in the February to April 2007 time period, nor did he provide any facts surrounding the alleged attempted purchases.

64.   Turner denied that such attempted purchases occurred.

65.   Wilson and Kolb continue to patronize McCarty's.

## II.   CONCLUSIONS OF LAW

1.   Plaintiff is a disabled individual within a protected class, disabled, under the ADA, Unruh Act, and the CDPA.

2.   To maintain an action in federal court, Plaintiff must meet the standing requirement of Article III of the United States Constitution that she suffered injury-in-fact as a result of allegedly illegal action. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).

3.   Plaintiff must establish "prudential standing," that is she must assert her own rights and interests, not those of a third party. *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975).

4.   The injury-in-fact in a retaliation case is the retaliatory action taken against the individual. *Bowden v. Redwood Inst. for Designed Educ.*, *Inc.*, No. C98-1312, 1999 WL 138889, at *4 (N.D. Cal. Mar. 9, 1999) ("The injury-in-fact is the retaliatory action taken against the individual.").

5.   The ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation or proceeding, or hearing under this chapter.

9

6.    To prove a prima facie case of retaliation under the ADA, a plaintiff must establish by a preponderance of the evidence: (1) she engaged in protected activity; (2) she was subject to adverse action; and (3) a causal link between the protected activity and the adverse action.  *See Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (ADA employment retaliation case); *Tater-Alexander v. Amerjan*, No. 1:08-cv-00372-OWW-SMS, 2008 WL 961233, at *8 (E.D. Cal. Apr. 8, 2008) (ADA public accommodation retaliation claim); *Munir v. Thomas*, No. CIV S-05-1996 MCE EFB P, 2008 WL 641110, at *9 (E.D. Cal. Mar. 5, 2008) (ADA public services retaliation claim)[1]; *Fields v. Marin Hous. Auth.*, No. C 99-04626 CRB, 2002 WL 145842, at *4-5, (N.D. Cal. Jan. 16, 2002) (same).

7.    When analyzing the elements of an ADA retaliation claim, it is appropriate to look to Title VII cases for guidance.  *See*, *e.g.*, *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 & n.5 (9th Cir. 2004) (borrowing, in an ADA case, the definition of an "adverse employment action" from a Title VII case, *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000), and noting that "a retaliation claim under the ADA is analyzed under the same framework" as a Title VII claim).

8.    "Protected activity" includes objecting to an action that is prohibited by the ADA.

9.    Plaintiff's filing of her original state court lawsuit alleging a violation of the ADA – for failure to provide an

_____

[1]    The *Munir* case consists of findings and recommendations from a magistrate judge which were subsequently adopted.  *See Munir v. Thomas*, 2008 WL 877839, No. 2:05-cv-01996-MCE-EFB P, 2008 WL 877839 (E.D. Cal. Mar. 28, 2008).

accessible restroom facility – constitutes protected activity. *Pardi*, 389 F.3d at 850 ("Pursuing one's rights under the ADA constitutes a protected activity."); *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 994 (C.D. Cal. 2000) (noting, in a Title VII retaliation case: "she [plaintiff] identifies a protected activity: filing this action").

10. Plaintiff had the right to be free from retaliation under the ADA, i.e., a right to be free from adverse action causally linked to her protected activity. Because the Unruh Act and the CDPA prohibit conduct forbidden under the ADA, plaintiff also had a right under the Unruh Act and CDPA to be free from retaliation proscribed by the ADA. *See* Cal. Civ. Code § 51(f) (a violation of the ADA is a violation under the Unruh Act); *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 847 (9th Cir. 2004) ("[A] violation of the ADA is, per se, a violation of the Unruh Act."); Cal. Civ. Code §§ 54(c), 54.1(d), 54.2(b) (a violation of the ADA is a violation under the CDPA); *Hubbard v. SoBreck, LLC,* 531 F.3d 983, 985 (9th Cir. 2008) ("A violation of the federal ADA constitutes a violation of the CDPA."). Plaintiff's claims under the Unruh Act and the CDPA are predicated on an underlying violation of the ADA.

11. Under the ADA, an adverse action is one that is "reasonably likely to deter [individuals] from engaging in protected activity." *Pardi*, 389 F.3d at 850 (ADA employment retaliation case) (quotation marks omitted); *Munir*, 2008 WL 641110, at *9 (quoting this standard in an ADA public services retaliation case); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (concluding that, in a Title VII employment retaliation case, a cognizable adverse action is one that "must be

1  harmful to the point that [it] could well dissuade a reasonable
2  worker from making or supporting a charge of discrimination");
3  *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2004) (noting
4  that, in an ADEA retaliation case, an adverse action is one that is
5  "reasonably likely to deter the charging party or others from
6  engaging in protected activity") (quotation marks omitted); *Brooks*
7  *v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (noting
8  that, in a Title VII employment retaliation case, "only non-trivial
9  . . . actions that would deter reasonable [individuals] from
10 complaining about Title VII violations will constitute actionable
11 retaliation").

12     12.  Not every action a defendant takes that affects a
13 plaintiff who has engaged in protected activity constitutes adverse
14 action.  *See Brooks*, 229 F.3d at 928; *cf. Brown*, 336 F.3d at 1192
15 (noting that not even the ADA's broader anti-interference provision
16 covers "any action whatsoever that in any way hinders a member of
17 a protected class") (quotation marks omitted).

18     13.  Adverse action must be sufficiently material, i.e., it
19 must be "non-trivial" in nature.  *Brooks*, 229 F.3d at 928; *see also*
20 *White*, 548 U.S. at 70 ("[W]e believe this standard [for actionable
21 retaliation] will screen out trivial conduct").  In the employment
22 context, a "termination [from employment], [the] dissemination of
23 a negative employment reference, [the] issuance of an undeserved
24 negative performance review and [the] refusal to consider [an
25 individual] for [a] promotion" have been considered adverse
26 employment actions.  *Brooks,* 229 F.3d at 928.  "Declining to hold
27 a job open for an employee," "badmouthing an employee outside the
28 job reference context," and "ostracism suffered at the hands of

1  coworkers" have not been considered adverse employment actions. *Id.*
2  at 928-29.

3      14.  As to causation, Plaintiff must prove, by a preponderance
4  of the evidence, that there is a causal link between her protected
5  activity and an adverse action.  *Poland*, 494 F.3d at 1181 n.2.
6  According to the terms of the statute, liability only arises when
7  adverse action was taken "because" the plaintiff engaged in
8  protected activity.  42 U.S.C. § 12203(a).  Although the statute
9  uses "because" language, this word does not mean that Plaintiff
10 must prove that the protected activity was the sole reason for the
11 adverse action.  *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th
12 Cir. 2005).  Rather, Plaintiff must prove that the protected
13 activity was "a motivating factor" in the adverse action.  *Id.*  The
14 adverse action must be "'based on a retaliatory motive,'" *Poland*,
15 494 F.3d at 1180; *Ray*, 217 F.3d 1243 n.6, but it need not be based
16 solely on a retaliatory motive.

17     15.  The evidence is not sufficient to prove that the posting
18 or displaying of the signs amounted to cognizable adverse action
19 under the ADA.[2]

20 ─────────────────

21     [2]  In his opening statement and closing argument, Defendant
   argued that given the date of the complaint, February 20, 2007, and
22 the evidence as to when the signs were posted, some of the signage
   may not fall within the ambit of the complaint.  The evidence does
23 show that the second sign was posted by late March or early April
   2007 when the portable ADA compliant bathroom was brought on site.
24 Defendant's argument, however, ignores the presence of the pretrial
   order, which specifically mentions *both* signs as being a part of
25 this case.  A "pretrial order generally supercedes the pleadings,
   and the parties are bound by its contents." *DP Aviation v. Smiths*
26 *Indus. Aerospace & Def. Sys. LTD*, 268 F.3d 829, 842 n.8 (9th Cir.
   2001) (quotation marks omitted).  Applying this rule, the Ninth
27 Circuit has looked to the pretrial order for purposes of
28

1    16.  Although the signs stated that the reason for the

2  bathroom closure was due to a lawsuit from Eula Kolb, this was an

3  accurate statement that was unaccompanied by any derogatory or

4  negative remarks about Plaintiff or any demeaning depictions,

5  drawings, or caricatures of Plaintiff.   The signs were not

6  billboards or large scale banners but rather consisted of postings

7  on the bathroom door in rather generic font.   The signs did not

8  disclose any medical or other sensitive facts about Plaintiff, nor

9  did they refer to her physical condition.  After the posting of the

10 signs, Plaintiff and her life partner, Wilson, continued to

11 patronize the store.  Neither objected to or complained about the

12 signs.  Plaintiff did not file any state law claims for defamation,

13 public disclosure of private facts, or breach of the Settlement

14 Agreement based on the signs and violation of any confidentiality

15 provisions.

16    17.  The conclusion that the posting or displaying of the

17 signs did not amount to adverse action is bolstered by and

18 consistent with the fact that Plaintiff's complaint does not allege

19 that the posting or displaying of the signs constituted an

20 actionable act of retaliation; instead she based her ADA claim, and

21 by extension her Unruh Act and CDPA claim, on an alleged "refus[al]

22 of service."  (Doc. 2 at 2.)   Similarly, in the pretrial order,

23 Plaintiff's requested relief is statutory damages for "four

24 separate retaliatory events" that correspond to the "four different

25 occasions . . . she went to patronize McCarty's Copper Inn and was

26 _____

27 "determining the scope of the claims presented."  *Id.*  Accordingly,
   Defendant's argument lacks merit — the pretrial order brings both
28 signs within the scope of this case.

**14**

1  refused service because of her previous lawsuit." (Doc. 24 at 3.)

2  Finally, in Plaintiff's pretrial brief, Plaintiff does not claim or

3  argue that the posting or displaying of the signs independently

4  constitutes an actionable act of retaliation. (*See* Doc. 26.)

5      18.  The conclusion that the posting or displaying of the

6  signs did not amount to adverse action is also corroborated by the

7  recognition that basing liability on the signs would be tantamount

8  to imposing a content-based restriction on truthful speech

9  implicating concerns within "the territory of the First Amendment."

10  *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591,

11  596-97 (5th Cir. 1995) (discussing speech-based sexual harassment

12  claims); *see also Avis Rent A Car Sys., Inc. v. Aguilar*, 529 U.S.

13  1138, 1141 (2000) (Thomas, J., dissenting from a denial of

14  certiorari) (recognizing that "content-based antidistrimination

15  law[s]" raise "difficult[]" First Amendment issues).    In

16  determining the scope of an "adverse employment action" the Ninth

17  Circuit has taken competing interests into consideration. *See*

18  *Brooks*, 229 F.3d at 928-29; *Nunez v. City of L.A.*, 147 F.3d 867,

19  874-75 (9th Cir. 1998) (declining to find "mere speech, in response

20  to speech" an adverse employment action).

21      19.  As for the alleged propane denials, Turner acknowledged

22  that Wilson was Kolb's partner and that they would come to the

23  store together.    Turner, from this knowledge, knew that denying

24  Wilson propane also denied Kolb propane.    That Turner knew the

25  propane was for Kolb is further evidenced by his acknowledgment

26  that Kolb often called to confirm Turner was available to dispense

27  propane and Kolb's unrebutted testimony that she frequently called

28  to assure that Turner would be available to dispense propane.

1      20.  As to the one occasion in January 2007 that Wilson
2  specifically testified he was denied propane and another female
3  employee was purportedly in the store, which was the first
4  purported denial of propane, the evidence does not preponderate to
5  show that there was an employee in the store on this occasion.
6  Among other things, the material inconsistency between Wilson's
7  account of where the oval mirror was situated, which is
8  contradicted by Turner's testimony as to the where the only mirror
9  in the store was situated, calls Wilson's testimony into question.
10  Wilson did not testify that he saw the putative employee's face in
11  the mirror.  He did not describe her clothing.  Wilson, who fills
12  his propane tank once every took weeks, did not provide the
13  putative employee's name despite his patronage of the store for the
14  past 40 years.  Turner testified that employees wear Chevron-
15  approved uniforms with name badges, yet Wilson did not testify that
16  the girl in the mirror was wearing a uniform.  Wilson was unable to
17  provide the date or the day of week on which this alleged denial
18  occurred or any details as to this alleged denial (or the date or
19  day of the week on which, or any details as to the circumstances
20  under which, the two other alleged denials occurred).

21      21.  The incident occurred around or after closing time.
22  There is no evidence that Turner dispenses propane to anyone after
23  closing time.

24      22.  Even assuming there was a girl with dark hair in the
25  mirror, the evidence on this issue makes it equally plausible that
26  she was a non-employee, which would provide another reason for
27  Turner to remain in the store.

28      23.  Turner denies refusing to sell propane to Wilson other

1  than on one occasion on a Sunday evening when no other employees
2  were there.

3      24.  Given that the evidence does not preponderate to show
4  that an employee was in the store on the first occasion Wilson
5  testified about, any denial of propane on that occasion, if such
6  denial occurred, is justified by virtue of Turner's facially-
7  neutral rule not to dispense propane when no other employees are in
8  the store.  *Cf. McAlindin v. County of S.D.*, 192 F.3d 1226, 1239
9  (9th Cir. 1999) (concluding that a retaliation claim under
10 California's Fair Employment and Housing Act failed where the
11 adverse actions did not occur because of the plaintiff's protected
12 activities; rather the evidence showed they occurred "because the
13 [defendant] followed universally-applied policies" pursuant to
14 which plaintiff "was treated like all other employees"); *Brown v.*
15 *Lucky Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001) (concluding
16 that an ADA discrimination claim failed where the plaintiff's
17 termination from employment did not occur because of her
18 disability; rather she was terminated pursuant to the employer's
19 "general policy" on unexcused absences).

20     25.  Plaintiff admitted that she and Wilson were sold propane
21 by Turner on numerous occasions (every two weeks) over the period
22 of February to April, 2007.

23     26.  Plaintiff has failed to sustain her burden of proof and
24 the evidence does not preponderate to show she was directly or
25 indirectly denied propane on this first occasion because of her
26 engagement in protected activity.

27     27.  As to the additional two purported propane denials,
28 neither Kolb nor Wilson could remember the dates or any discrete

17

1  details of these alleged refusals. Kolb did not enter the store on
2  these occasions and could not corroborate Wilson's testimony as to
3  what Turner purportedly told Wilson on any of these occasions.
4  Wilson provided no description of any words that were spoken, the
5  time of day, or any pertinent facts. Wilson acknowledged that he
6  did not see any other employees besides Turner on these two
7  occasions; and Kolb acknowledged that when she visits the store
8  with Wilson, she remains in her van and this impedes her ability to
9  see who is in the store. Kolb did not testify that other employees
10 were in the store on these two occasions.

11     28.   Turner denies refusing to sell propane to Wilson other
12 than one occasion on a Sunday evening when no other employees were
13 on duty. This denial of propane was justified pursuant to Turner's
14 facially-neutral rule not to dispense propane when no other
15 employees are in the store.

16     29.   In light of the trial testimony and the record evidence,
17 Plaintiff has failed to sustain her burden of proof and the
18 evidence does not preponderate to show that, on the other two
19 occasions Wilson testified to, Plaintiff was directly or indirectly
20 denied propane or that such denial, if it occurred, was because of
21 Plaintiff's engagement in protected activity.

22     30.   As to the purchase of the ice, the factual description by
23 Wilson is inconsistent with the undisputed long-standing practice
24 that customers serve themselves by taking ice out of the unlocked
25 ice cooler and bringing it to the sales counter to purchase.

26     31.   Turner denied ever refusing to sell ice to Wilson.

27     32.   Wilson has been visiting McCarty's for the past 40 years,
28 including in the years prior to the time of the alleged retaliation

1   when Turner owned the store.  It is not credible that Wilson would

2   not utilize the self-service method for the purchase of ice.  Kolb,

3   who was not in the store at the time, could not corroborate

4   Wilson's testimony as to what Turner purportedly told Wilson on

5   this occasion.

6       33.  The evidence does not preponderate in Plaintiff's favor

7   that she was directly or indirectly denied the purchase of ice by

8   Turner.

9       34.  Plaintiff has not proved retaliation under the ADA.

10      35.  The anti-interference provision of the ADA, 42 U.S.C. §

11  12203(b), states:

12          It shall be unlawful to coerce, intimidate, threaten, or
            interfere with any individual in the exercise or
13          enjoyment of, or on account of his or her having
            exercised or enjoyed, or on account of his or her having
14          aided or encouraged any other individual in the exercise
            or enjoyment of, any right granted or protected by this
15          chapter.

16      36.  To the extent Plaintiff claims a violation of the ADA's

17  anti-interference provision based on a violation of the ADA's anti-

18  retaliation provision, this claim (which is duplicative) fails by

19  virtue of Plaintiff's inability to prove retaliation under 42

20  U.S.C. § 12203(a).

21      37.  To the extent Plaintiff is claiming a separate and

22  distinct violation of the ADA's anti-interference provision,

23  plaintiff must prove, by a preponderance of the evidence, that she

24  was subject to "coerc[ion]," "intimidat[ion]," a "threat[]" or

25  "interference" within the meaning of the statute.

26      38.  The scope of the ADA's anti-interference provision is

27  "guided" by the Ninth Circuit's "treatment of the [Fair Housing

28  Act's] interference provision" which reaches "all practices [that]

19

1 have the effect of interfering with the exercise of rights under
2 the federal fair housing laws." *Brown*, 336 F.3d at 1191 (quotation
3 marks omitted).

4     39.   The ADA's anti-interference provision is not so "broad as
5 to prohibit any action whatsoever that in any way hinders a member
6 of a protected class." *Id.* at 1192 (quotation marks omitted).

7     40.   "Conclusory allegations" of coercion, intimidation,
8 threats, or interference are insufficient to support an ADA
9 interference claim. *Id.* at 1193.   An ADA plaintiff must
10 "demonstrate that she has suffered a distinct and palpable injury"
11 or "direct harm" as a result of the claimed coercion, intimidation,
12 threats or interference. *Id.* (quotation marks omitted).   For
13 example, "short-term memory problems" along with "extreme[]
14 stress[]" rise to the level of distinct and palpable injury
15 sufficient to support an ADA interference claim. *Id.*

16     41.   The evidence is insufficient to show that Plaintiff was
17 subject to "coerc[ion]," "intimidat[ion]," a "threat[]" or
18 "interference" within the meaning of the statute.

19     42.   There is no evidence that Turner coerced, intimidated, or
20 threatened Plaintiff on any occasion.

21     43.   The evidence is insufficient to show that Turner
22 interfered with Plaintiff's exercise of any rights under the ADA or
23 that anything he did had that effect.

24     44.   The evidence is insufficient to show that the posting or
25 displaying of the signs coerced, intimidated or threatened
26 Plaintiff or interfered with Plaintiff's exercise of any rights
27 under the ADA.   She was never in the store at any time alleged in
28 the complaint.   After the postage of the signs, Kolb and Wilson

1  continued to, and to the present, purchase propane from McCarty's.
2  There is no evidence that the signs had any effect on Plaintiff's
3  conduct.

4      45.   The evidence also is insufficient to show that, in
5  connection with the posting and displaying of the signs, Plaintiff
6  suffered anything approaching "short-term memory problems" or
7  "extreme[] stress[]" as a result of any conduct by Defendant.
8  *Brown*, 336 F.3d at 1193.

9      46.   As to propane, for the same reasons discussed above, the
10 evidence is insufficient to show that Plaintiff was directly or
11 indirectly denied propane or that, even if *arguendo* such denial
12 occurred, it was "on account of" her engagement in protected
13 activity under the statute and not due to a valid business practice
14 not to leave the store unattended to get propane.

15     47.   As to the ice, for the same reasons discussed above, the
16 evidence does not preponderate in Plaintiff's favor that she was
17 directly or indirectly denied the purchase of ice by Turner.

18     48.   Plaintiff has not proved a violation of the ADA's anti-
19 interference provision.

20     49.   Plaintiff has not proved an ADA violation.

21     50.   As Plaintiff has not proved an ADA violation, her claims
22 under the Unruh Act and the CDPA, which are predicated on an ADA
23 violation, fail as a matter of law.

24     51.   Given that Plaintiff has not proved an ADA violation,
25 there is no basis for the issuance of an injunction.  Plaintiff's
26 request for injunctive relief is DENIED.

27     52.   Judgment shall be entered in favor of Defendant and
28 against Plaintiff.

1    **III.   Attorney's Fees And Costs As To The ADA Claims**

2        53.   Under the ADA's fee provision, "attorney's fee[s],
3    including litigation expenses, *and costs*" are discretionary if the
4    defendant is the prevailing party.   42 U.S.C. § 12205 (emphasis
5    added).

6        54.   Pursuant to Ninth Circuit authority, attorney's fees
7    under § 12205 should be awarded to a prevailing defendant only when
8    the plaintiff's action was "'frivolous, unreasonable, or without
9    foundation.'" *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150,
10   1154 (9th Cir. 1997) (*quoting Christiansburg Garmet Co. v. EEOC*,
11   434 U.S. 412, 421 (1978)); *see also Brown,* 246 F.3d at 1190*.*

12       55.   When, as here, "the federal statute forming the basis for
13   the action has an express provision governing costs . . . that
14   provision controls over the federal rules," including Rule 54(d)(1)
15   of the Federal Rules of Civil Procedure.   *Brown*, 246 F.3d 1189-90.
16   "Because § 12205 makes fees and costs parallel . . . the
17   *Christiansburg* test also applies to an award of costs to a
18   prevailing defendant under the ADA." *Brown*, 246 F.3d 1190.

19       56.  A prevailing defendant in an ADA case can obtain
20   attorney's fees and costs under the *Christiansburg* standard if the
21   plaintiff's action was frivolous, unreasonable or without
22   foundation at the time the complaint was filed, *Tutor-Saliba Corp.*
23   *v. City of Hailey*, 452 F.3d 1055, 1060 (9th Cir. 2006), or if "the
24   plaintiff continued to litigate after it clearly became so,"
25   *Christiansburg*, 434 U.S. at 422. *See also Summers*, 127 F.3d at
26   1154.   An action is frivolous, unreasonable or without foundation
27   if it "lacks an arguable basis in law or in fact." *Peters v. Winco*
28   *Foods, Inc.*, 320 F. Supp. 2d 1035, 1037 (E.D. Cal. 2004), *aff'd*,

1  151 F. App'x 549 (9th Cir. 2005); *see also Mitchell v. Office of*
2  *L.A. County Superintendent of Sch.*, 805 F.2d 844, 847 (9th Cir.
3  1986) ("There is a significant difference between the bringing of
4  cases with no foundation in law or facts at the outset and the
5  failure to present evidence sufficient to justify relief at
6  trial.").

7      57.   The same analysis applies to attorney's fees as to costs.
8  The evidence does not show that, after filing her action, Plaintiff
9  continued to litigate notwithstanding a development that exposed
10  her action as clearly frivolous. *Marbled Murrelet v. Babbitt*, 182
11  F.3d 1091, 1096 (9th Cir. 1999) (concluding that a prevailing
12  defendant was not entitled to fees, stating "Pacific Lumber does
13  not point to any evidence developed during the course of litigation
14  that should have put EPIC on notice that its suit was frivolous.").

15      58.   An assessment of frivolity (frivolous, unreasonable, or
16  without foundation) at the time Plaintiff filed her complaint leads
17  to the conclusion that Defendant is not entitled to attorney's fees
18  or costs under the *Christiansburg* standard.

19      59.   The complaint asserts cognizable legal theories under the
20  ADA (and parallel state statutes) based on alleged retaliation for
21  pursuing and obtaining ADA relief.   Defendant did not file any
22  motion attacking the sufficiency of the complaint.   There was a
23  basis to suspect that Defendant, who was angry at Plaintiff and
24  unhappy about her lawsuit (and obviously still is), was retaliating
25  against Plaintiff.   The evidence at trial did not ultimately
26  preponderate.   The case was decided on credibility of the parties
27  and witnesses and weight of the evidence.   Plaintiff elicited some
28  testimony at trial to support her claims; however, Plaintiff

1  ultimately failed to meet her burden of proof and risk of non-
2  persuasion.    This evidentiary failure does not, by itself,
3  demonstrate frivolity under the *Christiansburg* standard. *Tutor-*
4  *Saliba Corp.*, 452 F.3d at 1060 (noting that, in applying the
5  *Christiansburg* standard, a court "must avoid post hoc reasoning by
6  concluding that, because a plaintiff did not ultimately prevail,
7  h[er] action must have been unreasonable or without foundation")
8  (quotation marks omitted).

9      60.   There is a dearth of authority on ADA retaliation claims
10  in the public accommodation context.   *See Shotz v. City of*
11  *Plantation, Fla.*, 344 F.3d 1161, 1181 n.31 (11th Cir. 2003) ("[W]e,
12  and most other courts, have never addressed a case of retaliation
13  [under the ADA] outside the employment context."); *Wilson v.*
14  *Murillo*, 163 Cal. App. 4th 1124, 1134 (2008) (stating, in an ADA
15  case, "[t]he vast majority of courts which have examined the
16  question of what conduct constitutes an 'adverse action' have done
17  so in the employment context").   The relative novelty of
18  Plaintifff's retaliation claim under the ADA cuts against a finding
19  of frivolity. *See Karam v. City of Burbank*, 352 F.3d 1188, 1195
20  (9th Cir. 2003) ("A case is less likely to be considered frivolous
21  when there is very little case law directly apposite.") (quotation
22  marks omitted).

23      61.   For all these reasons, Defendant is not entitled to
24  attorney's fees, expenses or costs for having prevailed with
25  respect to the ADA claims.

26          **IV.   Attorney's Fees And Costs As To The**
27              **Unruh Act And CDPA Claims**
28      62.   "[A] federal court exercising supplemental jurisdiction

over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000); *see also Mangold v. Cal. Pub. Utilities Comm'n,* 67 F.3d 1470, 1478 (9th Cir. 1995) ("The *Erie* principles apply equally in the context of pendent jurisdiction."). Pursuant to the *Erie* principles (*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)), "federal courts sitting in diversity apply state substantive law and federal procedural law." *In re Larry's Apartment*, *L.L.C.*, 249 F.3d 832, 837 (9th Cir. 2001) (quotation marks omitted).

63.   For *Erie* purposes, attorney's fees under state law are substantive when the availability of "those fees [is] connected to the substance of the case." *In re Larry's Apartment,* 249 F.3d at 838 (quotation marks omitted). In "action[s] involving state law claims, [federal courts] apply the law of the forum state to determine whether a party is entitled to attorneys' fees, unless it conflicts with a valid federal statute or procedural rule." *MRO Commc'ns, Inc. v. AT & T Co.*, 197 F.3d 1276, 1282 (9th Cir. 1999); *see also Kabatoff v. Safeco Ins. Co. of Am.,* 627 F.2d 207, 210 (9th Cir. 1980) ("In a diversity action, the question of attorney's fees is governed by state law."*); Shulz v. Lamb*, 591 F.2d 1268, 1273 (9th Cir. 1978) ("Federal courts . . . are required to apply state law in diversity actions with regard to the allowance or disallowance of attorney's fees.").

64.   Under California law, attorney's fees are allowable as costs under section 1032 of the California Code of Civil Procedure when they are "authorized by" either "Contract," "Statute," or

1  "Law." Cal. Code Civ. Proc. § 1033.5; *Santisas v. Goodin*, 17 Cal.

2  4th 599, 606 (1998).    "Thus, recoverable litigation costs do

3  include attorney fees, but only when the party entitled to costs

4  has a legal basis, independent of the cost statutes and grounded in

5  an agreement, statute, or other law, upon which to claim recovery

6  of attorney fees." *Santisas*, 17 Cal. 4th at 606.

7      65.   With respect to Plaintiff's claim under § 51 of the Unruh

8  Act, attorney's fees tied to "each and every offense" committed

9  under § 51 are recoverable by statute. *See* Cal. Civ. Code § 52(a)

10  (providing for attorney's fees when there is a proven offense under

11  § 51).   Accordingly, on a § 51 claim under the Unruh Act, state law

12  clearly permits an award of attorney's fees to a prevailing

13  plaintiff but not to a prevailing defendant such as Turner. *Molski*

14  *v. Arciero Wine Group*, 164 Cal. App 4th 786, 791 (2008) ("Under the

15  Unruh Civil Rights Act, the plaintiff can recover attorney's fees

16  if he or she prevails, but the defendant can not.").    Similarly,

17  with respect Plaintiff's claim under § 54 of the CDPA, attorney's

18  fees tied to "each offense" committed under § 54 are recoverable by

19  statute. *See* Cal. Civ. Code § 54.3(a) (providing for attorney's

20  fees when there is a proven offense under § 54).   Accordingly, on

21  a § 54 claim under the CDPA, state law clearly permits an award of

22  attorney's fees to a prevailing plaintiff but not to a prevailing

23  defendant such as Turner. *Molski*, 164 Cal. App. 4th at 792 ("As

24  with the Unruh Civil Rights Act, the plaintiff will be entitled to

25  attorney's fees if he or she prevails, but the defendant will

26  not.").    Defendant is not entitled to attorney's fees under the

27  Unruh Act or the CDPA.

28      66.   Costs, as a general matter, are procedural in nature such

that an award of costs is governed by federal, not state, law. *See Champion Produce, Inc. v. Ruby Robinson Co., Inc.,* 342 F.3d 1016, 1022 (9th Cir. 2003) ("An award of standard costs in federal district court is normally governed by Federal Rule of Civil Procedure 54(d), even in diversity cases"); *In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1120 n.2 (9th Cir. 1987) ("As a general proposition, the award of costs is governed by federal law under Rule 54(d)."); *see also Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1168 (9th Cir. 1995) (concluding that federal, not California, law governed an award of expert witness costs); *United Cal. Bank v. THC Fin. Corp.*, 557 F.2d 1351, 1361 (9th Cir. 1977) (applying Rule 54(d) with respect to costs and California law with respect to attorney's fees).

67.   As to state law claims in federal court, "a federal court . . . applies federal procedural rules and thus, will award costs in accordance with federal law unless a state law provision allows for the awarding of costs as part of a substantive, compensatory damages scheme."  *Kelly v. Echols*, No CIVF05118AWISMS, 2005 WL 2105309, at *16 (E.D. Cal. Aug. 30, 2005) (*citing Clausen v. M/V New Carissa*, 339 F.3d 1049, 1064-65 (9th Cir. 2003)).  Here, "[n]either section 52 of the Unruh Act nor section 54.3 of the Disabled Persons Act contain any provision regarding costs." *Dodson v. Pan Pac. Retail Properties, Inc.*, No. CIV S-02-0258 WBS KJM, 2003 WL 25656776, at *2 (E.D. Cal. June 13, 2003).  Accordingly, federal law controls.

68.   An award of costs under Rule 54(d)(1) as to the Unruh Act and CDPA claims would be improper given the circumstances of this case.  Plaintiff's Unruh Act and CDPA claims are predicated on an

underlying violation of the ADA.  Accordingly, "a grant of [costs] on the California cause[s] of action is necessarily a grant of [costs] as to the ADA claim[s]." *Hubbard*, 531 F.3d at 985.  As discussed above, given the lack of frivolity as to the ADA claims, Defendant is not entitled to costs for having successfully defended against the ADA claims.  It would be incongruous to deny the recovery of costs on the ADA claims and yet permit the recovery of costs as to the parallel state law Unruh Act and CDPA claims, which, here, use ADA jurisprudence in their interpretation and application.  A defendant should not be allowed to circumvent the ADA and its frivolity standard, nor undermine the policies furthered thereby, through invoking the more liberal standard under Rule 54(d)(1) with respect to parallel state law claims.

69.  Albeit without specifically analyzing whether federal or state law applied, at least one district court has looked to § 1032(b) of the California Code of Civil Procedure, rather than Rule 54(d), for purposes of determining a prevailing defendant's entitlement to costs in connection with claims under the Unruh Act and the CDPA.  *Dodson*, 2003 WL 25656776 at *2.  Even assuming *arguendo* § 1032(b) applies, the Ninth Circuit's recent *Hubbard* decision, which postdates *Dodson*, calls into question whether Defendant is entitled to costs as to the Unruh Act and CDPA claims.

70.  In *Hubbard*, the court concluded that in cases involving nonfrivolous ADA claims and parallel CDPA claims, the ADA (which does not permit the recovery of attorney's fees for the prevailing defendant on nonfrivolous claims) preempts the CDPA to the extent that the CDPA mandates an award of attorney's fees for the prevailing defendant on the CDPA claims.  531 F.3d at 984-87.  As

the Ninth Circuit explained:

> Therefore, to the extent that California's Section 55 mandates the imposition of fees on a losing plaintiff who brought both a nonfrivolous ADA action and a parallel action under Section 55, an award of attorney's fees under Section 55 would be inconsistent with the ADA, which would bar imposition of fees on the plaintiff. In such a case, the proof required to show a violation of the CDPA and of the ADA is identical. In that circumstance, it is impossible to distinguish the fees necessary to defend against the CDPA claim from those expended in defense against the ADA claim, so that a grant of fees on the California cause of action is necessarily a grant of fees as to the ADA claim. As federal law does not allow the grant of fees to defendants for non-frivolous ADA actions, we must conclude that preemption principles preclude the imposition of fees on a plaintiff for bringing nonfrivolous claims under state law that parallel claims also filed pursuant to the federal law.
>
> . . . .
>
> We hold only that to the extent that Section 55 does authorize the award of fees to a prevailing defendant on nonfrivolous CDPA state claims that parallel nonfrivolous ADA claims, the ADA preempts Section 55 of the CDPA.

*Id.* at 985, 987. Although the Ninth Circuit confined its holding to the recovery of *attorney's fees* under § 55 of the CDPA, which section is not at issue here,[3] the question remains whether *Hubbard's* logic applies to (and precludes) the recovery of *costs* under § 1032(b) with respect to Plaintiff's nonfrivolous Unruh Act and CDPA claims. In *Molski*, the California appellate court awarded attorney's fees to a prevailing defendant on a § 55 CDPA claim not found to be frivolous. 164 Cal. App. 4th at 792-93. The state court did not consider the *Hubbard* decision or federal ADA preemption.

---

[3] Section 55 of the CDPA calls for attorney's fees for the "prevailing party" in a CDPA injunction action; however, Plaintiff's complaint specifically states that Plaintiff is not seeking injunctive relief under § 55.

1      71.   In the context of this case, the choice to interpret the
2  Unruh Act and the CDPA claims consistent with the ADA and federal
3  jurisprudence justifies denial of costs to Defendant on the Unruh
4  Act and CDPA claims.   Given that the Unruh Act and CDPA claims
5  hinge on an ADA violation, and given traditional application of
6  *Erie* principles, it is more reasonable to consider the availability
7  of costs as arising under Rule 54(d)(1) as opposed to § 1032(b) of
8  the California Code of Civil Procedure.   And for the reasons
9  discussed above, the court exercises its discretion not to award
10  costs.

11      72.   Plaintiff shall lodge a form of judgment consistent with
12  these Findings of Fact and Conclusions of Law with the court within
13  five days following service of these Findings of Fact and
14  Conclusions of Law.

15

16  IT IS SO ORDERED.

17  **Dated:    December 31, 2008**            **/s/ Oliver W. Wanger**
18                                        UNITED STATES DISTRICT JUDGE